## Cincinnati, New Orleans and Texas Pacific Railway Company v. Gano and Burgess.

(Decided June 8, 1926.)

## Appeal from Scott Circuit Court.

1.  Carriers.—Carrier is not required to carry shipment of live stock through in shortest time, but only in reasonable time.

2.  Carriers—Evidence Merely Showing when Live Stock was Shipped and Received, Without Proof of when it Should have Been Received, Held Insufficient to Show it was Not Transported Within Reasonable Time.—Evidence merely showing when live stock was shipped and when it arrived at destination, without proof of when it should have arrived in ordinary course of business, held insufficient to show shipment was not transported in reasonable time.

3.  Evidence—Opinion Testimony of Stockman as to Loss of Weight of Stock Because of Alleged Failure to Transport Within Reasonable Time held Insufficient to Support Verdict for Damages.—In action against carrier for damage for failure to deliver live stock within reasonable time, opinion testimony of stockman as to loss of weight of stock, held insufficient when standing alone, without proof of weight at point of shipment or destination, or how they were watered or fed after they reached destination to support verdict for damages.

BRADLEY & BRADLEY and J. CRAIG BRADLEY for appellant.

H. C. FORD for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

Gano and Burgess shipped a carload of lambs from Sadieville, Kentucky, to Tobin and Shannon at the Jersey City Stock Yards by the Cincinnati, New Orleans and Texas Pacific Railway Company on August 20, 1923, and another carload on August 28th. The first shipment reached Jersey City Stock Yards on August 25th and the second on September 1st. But both were too late for the sales on that day. The lambs were sold on a subsequent day when the price had declined and this suit was brought to recover the damages by reason of the delay, both in the low price received and the loss in weight of the lambs from the delay. There was a verdict and judgment in favor of the plaintiffs for $484.72. The railway company appeals.

As to the undue delay, Mr. Gano testified that Gano and Burgess for a number of years had been shipping

like cars of stock from Sadieville to Tobin and Shannon at the Jersey City Stock Yards, making fifteen or twenty shipments a year, and that none of the other shipments failed to reach there in time for the market on the fourth day; that they generally figured on them reaching there in four days from the time they left Sadieville, to be sold on the market on the fourth day; sometimes they reached there on the third day and were sold. Mr. Shannon, of Tobin & Shannon, testified as follows:

> "We have been receiving shipments of live stock from Sadieville and other central Kentucky points for over twenty years, and we always figure, and usually received them during the night preceding the fourth day after shipment in time to be sold on that day, and sometimes we received them the third day after shipment from central Kentucky points."

The proof shows that the lambs that were shipped on August 28 reached the railroad yards at 8:30 a. m. on September 1. There were thirty-one cars of stock in the train and these cars were placed in the stock yards at the pens by the railroad men before 10:00 a. m., but the lambs were not yarded or taken out of the cars until after twelve o'clock, when the market had closed, September 1 being Saturday. The market ran on daylight savings time, which was one hour ahead of railroad time, beginning at eight o'clock and closing at twelve o'clock, daylight savings time. The market therefore closed an hour before the lambs were yarded, but it appears in the evidence that there was another load of lambs in this same train and that this carload wa ssold on September 1st.

There was no notice to the company that the lambs should be in Jersey City in time to be sold on the Saturday's market and no agreement to carry them there in time for that market. There is no proof in the record at what time of the day the lambs left Sadieville on the 28th or that the other shipments referred to left at the same hour. A few minutes' delay above the ordinary time might cause the lambs shipped on the 28th to fail to reach the yards in time for the market on September 1st, although in fact there was no unreasonable time consumed in the shipment. In 4 R. C. L., p. 956, the rule is thus stated:

> "The doctrine that when a common carrier undertakes to convey goods the law implies a contract

that they shall be carried and delivered at the place of destination safely and within a reasonable time applies to live stock as well as other property. Hence a carrier of live stock is liable for all damage that is referable to the negligent prolongation of the transportation through its natural effect on the physical condition or latent vicious propensities of the animals, whereby they are reduced in strength or weight more than they would have been had prompt carriage and delivery been made, or injure each other in consequence of viciousness, aroused by the excess of their confinement beyond the time necessary for transportation and delivery. Just what is a reasonable time, within which to make delivery where live stock is concerned cannot be defined by any geneeral rule, but must depend upon the circumstances of each particular case."

There is no evidence as to the schedule time of the train or as to the time it should have reached the Jersey City Stock Yards, if on time. The mere fact that the train did not reach there until 8:30 a. m. on September 1st is not sufficient to show that it was not carried through in a reasonable time, for the carrier is not required to carry the shipment through in the shortest time; he is only required to carry it through in a reasonable time, and while the delay of a few minutes might cause the car to miss the Saturday's market it would not, standing alone, be sufficient to show that the stock was not transported in a reasonable time. These lambs, under the regulations of the Interstate Commerce Commission, could not be carried through without stopping. Every thirty-six hours the stock has to be fed, watered and rested for five hours, and then it must wait for the next train to take it on. Necessarily there were two such stops with these lambs between Sadieville and New York, and there may have been some necessary delay at each stop before another train started. Under such circumstances the bare fact that the train did not reach Jersey City until 8:30 a. m. September 1, without any proof showing when it should have reached there in the ordinary course of business, is not sufficient to show that the transportation was not made in a reasonable time. While the evidence was sufficient to show this as to the shipment made on August 20th, it was not sufficient to sustain the recovery for the shipment made on August 28th.

As to the loss of weight of the lambs, Mr. Shannon, who had been selling such stock on the Jersey City market since the year 1900, makes this statement as to the shipment arriving September 1st, which was sold on Tuesday, September 4th, Monday being a legal holiday:

"There were 249 lambs in this shipment, and they weighed 16,150 pounds when sold. Lambs off grass when carried over here in the pens become stale and lose weight, and the longer they are held the more weight they will lose and the staler they will get. As they have to be fed continually on hay, the cost of carrying increases each day. The excess shrinkage on this car was six pounds per head, and the excess feed bill was $16.00. The extent of staleness and appearances was easily a half a cent a pound."

As to the shipment of August 20th, which was sold on Monday, August 27th, he makes this statement:

"There were 225 lambs, weighed when sold 14,560 pounds. Five sheep weighed when sold 780 pounds. One dead lamb not weighed. They arrived in good condition. They became stale and suffered an excess shrinkage of three pounds per head, and an excess feed bill. The excess feed bill on this shipment was small, as we had some feed left over that helped to carry this shipment."

This is the only evidence as to the loss of weight in the lambs and is simply the opinion of the witness as to how much they lost. It does not appear from his evidence that he actually saw or examined the lambs when they arrived and there is no evidence that the lambs were weighed until they were sold. The defendant earnestly insists that the evidence is incompetent. In McElwain v. Union Pacific Railway Co., 101 Neb. 484; 1 A. L. R. 533, the court having before it this question said:

"It is contended that the court erred in admitting evidence to prove alleged shrinkage in weight of the cattle while being held at the stockyards in Chicago. The aggregate weight of the cattle when weighed on the railroad scales, on their arrival at Chicago, and before watering, was 255,200 pounds. Their selling weight, Wednesday morning, was 256,410 pounds. Witnesses for plaintiff, experienced in

the live stock business, testified that the cattle ought to 'fill' 3 to 4 per cent, when watered and sold on their arrival. A witness called by defendant, who had been engaged in the live stock business in Chicago for nearly thirty years, on cross-examination, and without objection, testified to the same effect.

"Defendant cites Underwood v. Chicago & N. W. R. Co., 100 Neb. 275, 159 N. W. 408, in which it was stated in the syllabus: "The fact that there was a shrinkage of weight must be proved by competent evidence, and cannot be established by mere opinion evidence. This was correct as applied to the facts in that case, but it is not correct as a general rule. In that case the weight of the cattle at the point of the origin and destination was the same. The selling weight showed that the cattle had filled a little over 65 pounds a head on an average, which met the requirements indicated by the testimony on behalf of plaintiff. Under such evidence, opinion evidence that cattle, when held over one day, would shrink 30 pounds a head, was insufficient to support a finding of such a shrinkage, since the other evidence conclusively showed that there had been no shrinkage. In the present case, since the cattle at destination did not 'fill' to the usual amount, it was proper to show by stockmen that cattle being held for two days at destination would probably shrink 3 per cent.' "

The lambs had been on the cars and off grass for four days before they reached Jersey City. To intelligently determine their loss of weight in the three days they remained at Jersey City the jury should know what they weighed at Sadieville, or what they weighed when they reached Jersey City. The proof does not show how the lambs were watered or fed after they reached Jersey City, and without proof of some such facts as above indicated, the opinion evidence above quoted standing alone is not sufficient to sustain the verdict. The witness stated a mere abstract opinion without any personal knowledge as to the lambs is question, so far as appears.

Appeal granted, judgment reversed and cause remanded for a new trial.